UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAMSON ACQUISITION, INC., and
DAVID L. WILLIAMSON,

                    Plaintiffs,           03-CV-6666T

          v.                        **DECISION**
                                      **and ORDER**

PNC EQUITY MANAGEMENT CORP.,

                    Defendant.
_____

ARGILUS, LLC,

                    Plaintiffs,           04-CV-6259T

          v.

THE PNC FINANCIAL SERVICES GROUP, INC.,
PNC EQUITY CAPITAL, PNC EQUITY MANAGEMENT
CORP., and PNC EQUITY PARTNERS, L.P.,

                    Defendants.
_____


<u>INTRODUCTION</u>

    Plaintiffs Williamson Acquisition, Inc., ("WAI"), David L.
Williamson ("Williamson"), (collectively the "Williamson
plaintiffs") and Argilus, LLC ("Argilus") bring the above titled
actions against defendants PNC Financial Services Group, Inc., PNC
Equity Capital, PNC Equity Management Corp., and PNC Equity
Partners, L.P., (collectively "PNC"), claiming that the defendants
breached a contract with the plaintiffs; violated implied covenants
of good faith and fair dealing; unjustly enriched themselves at
plaintiffs expense; breached their fiduciary duties to the

plaintiffs, misappropriated trade secrets; converted plaintiffs property; and engaged in tortious interference with contract, unfair competition, and tortious interference with prospective business advantage. According to the plaintiffs, they hired PNC to assist them with purchasing the Griffith Oil Company, ("Griffith") a subsidiary of the Energy East Company. Plaintiffs claim, however, that after they and PNC failed to acquire Griffith, PNC, using confidential secrets that it learned during the negotiation process, and in violation of its agreements with and fiduciary duties to Argilus, Williamson, and WAI, solicited and assisted a different buyer in his successful acquisition of the company. Plaintiffs contend that as a result of defendants' actions, they were denied the opportunity to buy Griffith Oil, and were denied commissions on the sale of Griffith Oil.

By motion dated March 31, 2009, defendant PNC Equity Management Corp. moves for summary judgment against plaintiffs David L. Williamson and Williamson Acquisition, Inc., on grounds that there are no material issues of fact in dispute, and that it is entitled to judgment in its favor. By motion dated April 3, 2009, the PNC defendants move for summary judgment against plaintiff Argilus on grounds that there are no material questions of fact in dispute, and that they are entitled to judgment in their favor. Plaintiffs oppose the defendants motion contending that

there are several issues of fact in dispute, and that as a result, summary judgment may not be granted.

For the reasons set forth below, I grant the defendants' motions for summary judgment, and dismiss plaintiffs' complaints with prejudice.

<u>BACKGROUND</u>

The instant cases arise out of the same set of facts, and therefore, I discuss the factual background of both cases simultaneously.

In September, 2002, Energy East Corporation, an energy services company, through its agent Morgan Stanley & Company, ("Morgan Stanley") offered for sale a subsidiary of Energy East, the Griffith Oil Company ("Griffith" or "Griffith Oil"). Plaintiff David Williamson, who had experience in the energy industry as an owner of an energy corporation, was interested in purchasing Griffith, and entered into a confidentiality agreement with Morgan Stanley pursuant to which he received from Morgan Stanley a confidential offering memorandum regarding Griffith. In October, 2002 Williamson, on behalf of a yet-to-be-created company that would purchase Griffith, submitted to Morgan Stanley a proposal for the purchase of Griffith. Williamson's proposal was well received, and he, along with a limited number of select potential buyers, was allowed to proceed with further investigation into the purchase of Griffith.

Williamson engaged in extensive investigation into Griffith, and began investigating financing options for the purchase of the company. With respect to financing, in November, 2002, Williamson entered into an agreement with plaintiff Argilus pursuant to which Argilus was to act as Williamson's exclusive financial advisor (hereinafter the "Williamson-Argilus Agreement"). Pursuant to the terms of the Williamson-Argilus Agreement, in return for acting as Williamson's financial advisor, Argilus was to be paid $25,000.00 up front, and was to receive $1.2 in commissions (referred to as a "success fee") upon completion of the sale of Griffith to Williamson. Argilus was also given stock options to purchase shares of the new company formed to purchase Griffith upon completion of the sale to Williamson.

In an effort to obtain financing for a possible bid to purchase Griffith, Argilus, on behalf of Williamson, contacted PNC, as well as other equity firms, to determine interest in putting together a financing package. PNC expressed interest in working with Argilus and Williamson, and on November 26, 2002, entered into a confidentiality agreement with Argilus, (which was acting on behalf of Williamson Acquisition Incorporated) whereby PNC agreed not to disclose any confidential information learned about a company described in the Agreement as an "Energy Co." According to PNC, the "Energy Co." referred to in the agreement was Griffith, which was being offered for sale confidentially by Energy East and

Morgan Stanley, which companies required that interested investors maintain confidentiality about the identity of Griffith. According to PNC, because WAI, Williamson, and Argilus were not allowed to disclose the identity of Griffith without a confidentiality agreement in place with PNC, the PNC-Argilus Agreement was required to protect the confidentiality of Griffith.  Indeed, Griffith was referred to as "Energy Co." by Argilus in promotional materials it sent to prospective lenders.

Argilus and WAI contend that the confidentiality agreement pertained to WAI and Williamson's confidential information, despite the fact that WAI had not been incorporated at the time, and neither entity constituted an "Energy Company."  Other than the PNC-Argilus Confidentiality Agreement, PNC did not enter into any other written agreements with Argilus, Williamson, or WAI.[1]

On December 2, 2002, Williamson met with representatives of PNC in Pittsburgh, Pennsylvania, to further discuss the proposed acquisition of Griffith.  According to the plaintiffs, Williamson, divulged more confidential information about his proposed bid for Griffith at the meeting.

On December 5, 2002, Williamson initiated the incorporation of Williamson Acquisition, which, according to the plaintiffs, was to

---

[1] David Williamson testified that other than the first page of an informational memorandum (which was not signed by the parties) the only written agreement between WAI and PNC was the PNC-Argilus Confidentiality Agreement.  Deposition Testimony of David Williamson at pp. 120-121.

be the company that would purchase Griffith.[2]  That same day, Williamson sent a purchase offer for Griffith (the "Williamson Offer"), on behalf of WAI, to Morgan Stanley.  The purchase offer contained a December 5, 2002 letter from PNC outlining the terms of the offer.  Energy East considered the Williamson Offer along with offers from at least two other entities.  According to the plaintiffs' Complaints, PNC initially indicated to Williamson that Energy East was enthusiastic about the Williamson Offer, but later, told Williamson that the sale would go through only if Williamson accepted a reduced role in Griffith Oil upon completion of the sale.  According to Williamson, Energy East told PNC that the management of Griffith had strong reservations about working with Williamson.  The Complaints allege that PNC then engaged in its own due diligence (without informing Williamson or gaining Williamson's consent) and learned for itself that the management of Griffith refused to work with Williamson.  While the plaintiffs contend that the allegations regarding Griffith's reluctance to work with Williamson are false, the plaintiffs nevertheless acknowledge that as of January 17, 2003, Energy East had decided to terminate all negotiations with all potential buyers of Griffith, and rejected all offers to purchase the company.  According to Williamson, even if Energy East had not rejected the WAI offer, he would not have

---

[2] Incorporation papers were completed and filed on December 11, 2002.

gone forward with the deal if he could not control Griffith. Deposition Testimony of David Williamson at p. 214-215.

Despite having rejected all bids for Griffith, in February, 2003, Griffith contacted PNC, and asked PNC to contact Philip Saunders ("Saunders"), a former owner of Griffith, to determine if Saunders would have interest in purchasing Griffith if Griffith were once again available for sale.[3] According to the defendants, Saunders expressed such an interest, and negotiations to sell the company took place in June, 2003. PNC worked with Saunders in all aspects of the negotiations, and as part of the purchase deal, became a part owner of Griffith. By November, 2003, the sale of Griffith to Saunders and PNC was completed. Thereafter, Williamson and Argilus each brought separate actions against PNC claiming that PNC, by participating in the purchase of Griffith with Saunders breached its contractual and common law duties to the plaintiffs.

<u>DISCUSSION</u>

I. <u>The Defendant's Motion for Summary Judgment</u>

_____ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[3] The Plaintiffs contend that it was PNC, not Griffith, that initiated the discussions with Saunders, and that doing so violated PNC's contractual and common law duties to Williamson and Argilus . For the reasons set forth in the discussion section below, I find that the uncontroverted evidence indicates that Griffith initiated conversations with PNC regarding the sale of Griffith to Saunders.

movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. <u>Scott</u>, 550 U.S. at 380 (citing <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986).

II. <u>The Argilus Claims</u>

Plaintiff Argilus brings eight causes of action against the PNC defendants claiming that the defendants are liable for: (1) breach of contract, (2) unjust enrichment; (3) quantum meruit; (4) breach of the implied covenant of good faith and fair dealing, (5) tortious interference with contract; (6) tortious interference with prospective advantage and unfair competition (7) misappropriation of trade secrets and unfair competition; and (8) conversion. I discuss these claims <u>seriatim</u>.

A. <u>Breach of Contract</u>

1. <u>The Commission Contract</u>

Argilus claims that it was a party to the Williamson-Argilus Agreement, pursuant to which it was entitled to a fee of $1.2 million if Williamson, through his company WAI, was successful in purchasing Griffith Oil. Argilus further claims that because PNC

became a joint venturer with Williamson and WAI, and a part-owner of WAI, PNC became liable to Argilus under the Williamson-Argilus Agreement upon Saunders' purchase of Griffith, because PNC itself became a part owner of Griffith as a part of that sale. PNC counters that because it was not a party to the Williamson-Argilus contract, and because the Williamson-Argilus Agreement specifically provides that third-parties such as PNC are not subject to the terms or conditions of the Williamson-Argilus Agreement, it can not be held liable to Argilus for payment of the $1.2 million success fee. PNC also claims that although there was a proposal that PNC become a part-owner of WAI, that proposal was never acted on, and at no time did PNC ever become an owner of WAI.

To state a claim for breach of contract under New York law, a plaintiff must establish: (1) the existence of a valid contract, (2) performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages. First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2nd Cir. 1998)(citing Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir.1994); Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2nd Cir. 2004)("To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant,

and (4) damages.'")(quoting <u>Harsco Corp. v. Sequi</u>, 91 F.3d 337, 348 (2d Cir.1996).

In the instant case, the plaintiff has failed to establish the existence of a valid, binding contract between PNC and Argilus under which PNC agreed to pay success fees to Argilus. This is because the Williamson-Argilus Agreement, upon which plaintiff relies as establishing a contractual obligation between PNC and Argilus, specifically and unambiguously provides that the Agreement applies only to Williamson, WAI, and Argilus, and "is not intended to confer any rights upon any other individual shareholder, owner, creditor or partner of the [WAI] . . . or any other person not a party hereto . . . ." Williamson-Argilus Agreement at ¶ 9. Accordingly, even assuming that PNC was a shareholder, owner, partner or joint venturer of Williamson or WAI, the Williamson-Argilus Agreement specifically excludes PNC from the rights, benefits, or obligations of the agreement.[4] I therefore find that PNC was not a party to any written contract with Argilus under which it was obligated to pay any fees to Argilus, and as a result, I deny plaintiff Argilus's claim for breach of contract.

Nor can the plaintiff establish that PNC was obligated to pay Argilus's success fee pursuant to the terms of an oral contract. New York State's statute of frauds specifically requires that any

---

[4] The undisputed evidence contained in the record demonstrates that at no time did PNC ever become a part-owner of WAI.

contract "to pay compensation for services rendered in negotiating a . . . purchase . . . of any . . . business . . . ." shall be in writing.  N.Y. Gen. Ob. L. § 5-701.  Because Argilus seeks compensation for its role in consummating the purchase of Griffith by Williamson and WAI, any oral agreement regarding that compensation is void and unenforceable under the Statute of Frauds. Argilus' attempts to characterize the oral agreement as something other than an agreement to compensate it for its role in facilitating the purchase of Griffith by Williamson and WAI, or rely on the doctrine of promissory estoppel, are unavailing.  To invoke a claim based on promissory estoppel, Argilus must establish that there was a clear and unambiguous promise by PNC to pay Argilus a success fee.  See Sugerman v. MCY Music World, Inc., 158 F.Supp.2d 316, 325 (S.D.N.Y. 2001)(doctrine of promissory estoppel requires that a clear and unambiguous promise was made to the plaintiff).  There is no evidence in the record that PNC made such a promise to Argilus, and accordingly, I find that the doctrine of promissory estoppel does not apply.

     2.   The Confidentiality Agreement

It is undisputed that PNC and Argilus were parties to a confidentiality agreement dated November 26, 2002, pursuant to which PNC agreed to keep confidential all confidential information it learned during the attempted acquisition of Griffith Oil by Williamson and WAI.  The parties do dispute, however, whether or

not the PNC-Argilus Confidentiality Agreement required PNC to keep information that it learned about Griffith confidential, or whether the agreement related to information learned about WAI. Specifically, PNC claims that the PNC-Argilus Confidentiality Agreement required it to keep confidential information it learned about Griffith, whereas Argilus claims that the intent of the Agreement was to protect WAI's confidential information.

I find that the PNC-Argilus Confidentiality Agreement was intended to prevent PNC from disclosing confidential information that it learned about Griffith, and did not apply to confidential information learned about WAI. Initially, the PNC-Argilus Confidentiality Agreement refers to the subject of the agreement, about which confidentiality is to be maintained, as the "Energy Co." At the time of the agreement, WAI had not yet been incorporated, and was not an energy company, but an acquisition company. Moreover, Argilus admits in its Statement of Material Facts in Dispute at ¶ 7, that "[i]t was understood by all parties involved [in the PNC-Argilus Confidentiality Agreement] that Argilus would be providing PNC with information relating to a 'leading distributor of propane and heating oil products for over 100,000 residential customers located in the Northern United States.'" citing the Affidavit of David Williamson. That company was Griffith Oil, not the then-non-existent WAI. Finally, the term "Energy Co." had been used by Argilus when referring to Griffith in

previous documents sent to potential investors. WAI, Williamson and Argilus were bound by agreements executed with Morgan Stanley to keep the identity of Griffith Oil confidential, so that it would not become public knowledge that Energy East was interested in selling the company. Because the plaintiffs could not disclose the identity of Griffith to PNC prior to obtaining PNC's pledge to keep that information confidential, the plaintiffs referred to Griffith as "Energy Co." in the PNC-Argilus Confidentiality Agreement, and accordingly, pursuant to that agreement, PNC was obligated to Griffith to keep Griffith information confidential. Plaintiffs have simply offered no credible evidence upon which any trier of fact could reasonably conclude that the "energy company" referred to in the PNC-Argilus Confidentiality Agreement was WAI.

Regardless of whether the PNC-Argilus Confidentiality Agreement applied to confidential information about WAI or Griffith, Argilus claims that PNC breached this agreement by disclosing confidential information about WAI and Griffith to Phil Saunders, the eventual purchaser of Griffith Oil. Argilus, however, has failed to submit *any* evidence in support of this conclusory allegation. Following full and exhaustive discovery, the best "evidence" that Argilus can supply in support of its contention that PNC disclosed confidential information is the conclusory allegation that many of the documents contained in the Saunders proposal to buy Griffith are similar to documents

contained in the WAI proposal to purchase Griffith, and the subjective claim that the Saunders deal was finalized in a short amount of time (apparently suggesting that PNC used confidential information to jump-start the process to purchase Griffith). Such allegations, however, are not evidence that PNC breached its confidential agreement with Argilus. Standing alone, similarities between documents used in the different proposals are not evidence that PNC disclosed confidential information. Similarly, Argilus' subjective conclusion that the speed of the transaction demonstrates that PNC must have relied on information it had already received during the previous WAI acquisition attempt is without evidentiary support or import, as there is simply no testimonial or documentary evidence in the record to even suggest, no less establish, that PNC disclosed any confidential information subject to the PNC-Argilus Confidentiality Agreement to any other entity.

Nor has Argilus established that PNC improperly used the confidential information it received while working on the WAI acquisition to attempt to find another bidder for Griffith. The uncontroverted testimony of Robert Sant, the General Counsel for Griffith, reveals that after all bids for Griffith were rejected in January 2003, Sant contacted PNC to determine whether or not it would be interested in working with Saunders if in fact Saunders was interested in purchasing Griffith. Accordingly, there is no

evidence that PNC breached the PNC-Argilus confidentiality Agreement by searching out alternative investors for an acquisition of Griffith. As a result, I find that Argilus has failed to establish a claim for breach of contract based on the alleged breach of the PNC-Argilus Confidentiality Agreement.

     B.   <u>Unjust Enrichment</u>

Argilus contends that PNC unjustly benefitted from its relationship with Argilus, Williamson and WAI by obtaining confidential information about those entities and Griffith, and then using that information to successfully purchase Griffith Oil with a different investor, thus depriving Argilus of its success fee, and an opportunity to own a portion of Griffith.

The elements of claim for unjust enrichment under New York law are (1) a benefit to the defendant (2) at the plaintiff's expense, which (3) in "equity and good conscience" should be restored. <u>See</u> <u>Kaye</u>, 202 F.3d at 616. Under New York law, quasi-contractual claims such as unjust enrichment are barred if a written contract between the parties governs the subject matter of their dispute. <u>See</u> <u>Briggs v. Goodyear Tire & Rubber Co.</u>, 79 F.Supp.2d 228, 236 (W.D.N.Y.1999).

Because the Agreement between PNC and Argilus speaks only to the issue of confidentiality of certain information, and not to any type of payment by any party for any services, Argilus' claim for unjust enrichment is not barred by the PNC-Argilus Confidentiality

Agreement.    Nevertheless, Argilus has failed to state a claim against PNC for unjust enrichment.    There is no showing that PNC received a benefit at the expense of the defendant that should, in good conscience, be restored to Argilus.    Rather, the evidence shows that Energy East rejected WAI's bid to purchase Griffith in January, 2003; rejected all other potential buyer's bids, and took Griffith off of the market.    <u>See</u> Deposition Testimony of David Williamson at pp 247-248 (acknowledging that on January 17, 2003, Williamson learned that "Energy East was pulling the plug on the transaction itself" because "they did not think . . . that it was proper timing for the sale of the company.")    Accordingly, there was no benefit to be had by Argilus once Energy East rejected the WAI bid.    Nor was there any obligation on behalf of PNC to refrain from working on behalf of a different investor once the WAI bid had been rejected:    there was no agreement in place between PNC and either Argilus, Williamson, or WAI that prevented PNC from working with a separate investor once the WAI bid was rejected.    Moreover, there is no evidence in the record that PNC caused Energy East to reject the WAI bid.    As a result, Argilus can not establish that PNC received a benefit at Argilus' expense.

     C.    <u>Quantum Meruit</u>

Argilus contends that from November 14, 2002, when Argilus first contacted PNC regarding financing for the Griffith

acquisition project, through January 17, 2003, when Energy East rejected WAI's bid, Argilus spent thousands of man hours providing services to PNC, including educating PNC about Griffith Oil, and the heating industry in general, and providing and reviewing financial, environmental, and operational data. According to Argilus, it is entitled to payment for these services on a quantum meruit basis, in an amount equal to the success fee it would have earned upon completion of the sale of Griffith to WAI.

Quantum meruit is a doctrine of "quasi contract." Zolotar v. New York Life Insurance Company, 576 N.Y.S.2d 850, 852 (1st Dep't 1991). A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent unjust enrichment." Clark-Fitzpatrick, Inc. v. Long Island Rail Road Company, 70 N.Y.2d 382, 388 (1987). Indeed, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388 (internal citations omitted).

In the instant case, there was a specific, valid, and enforceable agreement between Argilus and Williamson that governed the payment of Argilus' success fee. That Agreement specifically provided that Williamson and WAI, and only those entities, were responsible for the payment of Argilus' success fee. Accordingly,

because a contract governs the subject matter of Argilus' quantum meruit claim against PNC (that PNC is obligated to pay the success fee), Argilus may not recover for the payment of the fee against PNC on a theory of quantum meruit. Clark-Fitzpatrick, Inc., 70 N.Y.2d at 388. Moreover, because PNC is not a party to the contract between Williamson and Argilus regarding the payment of fees, PNC is not obligated to pay the success fee pursuant to any contractual obligation. I therefore grant defendant's motion to dismiss plaintiff's claims for quantum meruit.

D.   Breach of Implied Covenant of Good Faith and Fair Dealing

Argilus contends that PNC violated the implied covenant of good faith and fair dealing with respect to their contractual relationship by assisting Saunders in the purchase of Griffith, to the detriment of Argilus, Williamson, and WAI.

"New York law imposes an implied covenant of good faith and fair dealing in all contracts, 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Peabody v. Weider Publications, Inc., 2006 WL 3802214, *5 (S.D.N.Y. Dec. 26, 2006)(quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir.2006) (citation omitted)). "Implicit in every contract is a promise of good faith and fair dealing, which is breached when a party acts in a manner that,

although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement." <u>Skillgames, LLC v. Brody</u>, 767 N.Y.S.2d 418, 422 (1st Dep't 2003).

In the instant case, the only contract to which PNC and Argilus were parties was the confidentiality agreement, which imposed a duty on PNC not to disclose confidential information that it learned during the attempted acquisition of Griffith by WAI and Williamson. As stated above, the record is devoid of any evidence that PNC breached that contract or engaged in any activity that while not technically a breach, nevertheless deprived Argilus of any benefit under the agreement. As a result, Argilus has failed to state a claim for the breach of the implied covenant of good faith and fair dealing.

E. <u>Tortious Interference with Contract</u>

Argilus contends that it had an agreement with Williamson pursuant to which it was to earn $1.2 million upon the sale of Griffith to WAI. Argilus further contends that PNC knew of this contract and took action to prevent Argilus from collecting its success fee.

To state a claim for tortious interference with contractual relations, a plaintiff must allege (1) the existence of a valid, enforceable contract between plaintiff and a third party; (2) knowledge of that contract by the defendant; (3) defendant's

intentional inducement of a breach by the third party to the contract; and (4) resulting damages.  <u>NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.</u>, 87 N.Y.2d 614, 620-21.

In the instant case, Argilus has failed to establish that PNC intentionally induced WAI or Williamson to breach its contract with Argilus, and therefore, has failed to state a claim for interference with contractual relations.  There is no evidence in the record that PNC convinced or attempted to convince WAI or Williamson to breach the Williamson-Argilus Agreement. Accordingly, Argilus has failed to state a cause of action for tortious interference with contract.

F.   <u>Tortious Interference with Prospective Advantage and Unfair Competition</u>

Argilus alleges that it and WAI had business relations with Energy East and Griffith Oil, and that PNC intentionally interfered with those relations for the purpose of harming Argilus and obtaining a transaction fee and other benefits for itself.  Argilus claims that PNC did this by breaching the PNC-Argilus Confidentiality Agreement, and specifically by sharing confidential information about Griffith, WAI, Argilus, and Williamson with other potential bidders for Griffith.

To state a claim for tortious interference with business relations, the plaintiff must show: (1) business relations with a third party; (2) interference with those relations; (3) that the defendant acted with the sole purpose of harming plaintiff or used

illegal or wrongful means; and (4) injury to the plaintiff. NBT Bancorp., 87 N.Y.2d at 624. Under New York law, if a defendant acts at least in part to advance its own interests, then an action for interference with prospective business relations cannot be maintained under the theory that the defendant acted with the sole purpose of harming the plaintiff. PPX Enterprises Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266 (2nd Cir. 1987); Building Industry Fund v. Local Union No. 3, Intern. Brotherhood of Electrical Workers, AFL-CIO, 992 F.Supp. 162; (E.D.N.Y.) on reconsideration, 992 F.Supp. 192; aff'd 141 F.3d 1151 (2nd Cir. 1996). To state a claim in cases where the defendant does act at least in part out of self economic interest, a plaintiff alleging tortious interference with business relations must allege that the defendant engaged in "wrongful means" in so interfering. 71 Pierrepont Associates v. 71 Pierrepont Corp., 663 N.Y.S.2d 263, 263-64 (N.Y.A.D. 2nd Dept. 1997). "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract" Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp., 50 N.Y.2d 183, 191 (N.Y., 1980).

Because Argilus alleges that PNC acted out of economic self-interest when it interfered with Argilus' business relations with

Griffith Oil and Energy East, Argilus must establish that PNC used wrongful means to interfere with the relations between Argilus and Energy East. As there are no allegations that PNC used physical violence, civil suits, or criminal prosecutions to interfere with Argilus' business relations with Griffith and Energy East, Argilus must establish that PNC engaged in misrepresentation or fraud with respect to its dealings with Argilus and Griffith Oil.

While Argilus alleges that PNC made misrepresentations to Energy East and/or Griffith Oil, Argilus has provided no evidence whatsoever that PNC engaged in such conduct. There is no evidence that PNC, intentionally or otherwise, engaged in any act that had the purpose or effect of hindering WAI's attempted purchase of Griffith. Similarly, there is absolutely no evidence that PNC made any misrepresentations to Energy East or Griffith, or engaged in any fraudulent behavior for any purpose. As a result, I find that Argilus has failed to establish that PNC engaged in any tortious interference with business relations.

G.   <u>Misappropriation of Trade Secrets and Unfair Competition</u>

Argilus contends that PNC misappropriated valuable trade secrets regarding the business dealings and operations of Argilus, WAI, Williamson, Energy East, and Griffith. Argilus claims that once PNC obtained the confidential information, it exploited that information for the purpose of preventing WAI from consummating the

purchase of Griffith, and enabling a different investor to purchase Griffith.

To state a claim under New York law for misappropriation of trade secrets, a plaintiff must establish that: (1) it possessed a trade secret, and (2) that the defendant used the plaintiff's trade secret in breach of an agreement, confidence, or duty, or as a result of discovery of the trade secret by improper means. <u>Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.</u>, 920 F.2d 171, 173 (2nd Cir. 1990).

In the instant case, plaintiff has failed to establish that PNC used any of the confidential information it obtained during the failed attempt to purchase Griffith. There is no evidence in the record suggesting that PNC used any information it obtained confidentially from Griffith, Energy East, Argilus, WAI, or Williamson during its attempt with Saunders to purchase Griffith. because Argilus' claims that PNC used confidential information are merely conclusory, and are unsupported by any evidence in the record, I find that Argilus has failed to establish a claim for misappropriation of trade secrets.

H.   <u>Conversion</u>

Argilus alleges that while it was working with PNC in an attempt to purchase Griffith on behalf of Williamson and WAI, Argilus produced and developed significant amounts of confidential information and data that it shared with PNC, and that PNC failed

to return that information and data to Argilus, despite Argilus' demand for return of the material. Argilus contends that PNC has converted Argilus' property by wrongfully taking the information and data developed by Argilus, and has deprived Argilus of that information and data.

Conversion is an "unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981)). To state a claim for conversion, a plaintiff must establish legal ownership to a specific thing and that the defendant exercised unauthorized dominion over that property to the exclusion of plaintiff. Id. at 242-43. "Where possession of the property is initially lawful, conversion occurs when there is a refusal to return the property after a demand." Capital Distributions Services, Ltd., 440 F.Supp.2d at 208.

Argilus has failed to establish that PNC has exercised unauthorized dominion over any property legally owned by Argilus to the exclusion of Argilus. Even if Argilus could establish that PNC utilized confidential information in violation of the Argilus-PNC Confidentiality Agreement, an allegation that information was used in such a way does not state a claim for conversion, as PNC did not exercise dominion over the information to the exclusion of Argilus. Nor is there any evidence in the record that PNC exercised control

over Argilus' property to the exclusion of Argilus.  I therefore dismiss Argilus' claim for conversion.

III. <u>The Williamson Claims</u>

Plaintiff Williamson and WAI bring four causes of action against PNC, claiming that PNC is liable for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment, and (4) breach of fiduciary duty.

A.  <u>Breach of Contract</u>

Williamson and WAI allege that PNC breached the PNC-Argilus Confidentiality Agreement by disclosing confidential information in violation of the terms of the agreement, failing to return the confidential information, and entering into a purchase agreement for Griffith with a different investor group.

As stated above, to state a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid contract, (2) performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages.  <u>First Investors Corp.</u>, 152 F.3d at 168 (citations omitted).

In the instant case, plaintiff has failed to establish a breach of the PNC-Argilus Confidentiality Agreement.  As stated above, the PNC-Argilus Confidentiality Agreement required PNC to keep as confidential information it learned about Griffith during the WAI acquisition project. As also previously stated, there is no evidence in the record that would raise even a question of fact as

to whether or not PNC violated this agreement. There is no documentary or testimonial evidence suggestion that PNC disclosed confidential information in violation of the PNC-Argilus Confidentiality Agreement. The purported evidence of a breach cited by Williamson and WAI, that there are similarities in proposal documents and the allegedly rapid speed with which the sale to Saunders took place, do not establish a breach of a duty to keep certain information confidential. Additionally, because the PNC-Argilus Confidentiality Agreement pertained to keeping Griffith information confidential, and there can be no claim for disclosing confidential Griffith information to Griffith. Moreover, Griffith retained the right to waive any portion of the confidentiality requirements, and it is fair to say that it did so when it solicited PNC to take part in a purchase offer for the company.

The Williamson plaintiffs further contend that PNC became contractually obligated to Williamson pursuant to several proposals and correspondence transmitted between the companies. These documents, however, do not, either singly or combined, manifest any intent to contract between the parties. As such, I find that the correspondence, memoranda, and proposals sent between the companies and/or to third parties do not establish a binding contract between the parties, and therefore do not establish the basis for a breach of contract claim.

B.  <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

Williamson and WAI contend that PNC undertook a duty of good faith and fair dealing when it entered into the PNC-Argilus Confidentiality Agreement.  The Williamson plaintiffs further contend that PNC breached its duty of good faith and fair dealing when it failed to return the confidential information it obtained from Williamson and WAI, and instead used that information in connection with PNC's purchase of Griffith with Saunders.

As stated in Section II(A)(2) above, I find that the PNC-Argilus Confidentiality Agreement protected the confidentiality of Griffith information, and that only Griffith retained the right to demand return of confidential information.  <u>See</u> PNC-Argilus Confidentiality Agreement at ¶ 7 (providing that if PNC withdrew or failed to consummate a transaction with Griffith, or upon Griffith's request, PNC was required to return all confidential materials to Griffith).  Accordingly, I find that the Williamson plaintiffs have failed to establish a claim for the breach of the implied covenant of good faith and fair dealing.  There is no evidence that the defendants used the confidential information it gathered in any way that violated the PNC-Argilus Confidentiality Agreement.  The provision requiring return of the information could be invoked only by Griffith, not WAI,  Williamson, or Argilus, and the information was to be returned to Griffith, not Williamson, WAI, or Argilus.  I therefore grant PNC's motion to dismiss the

Williamson Plaintiffs' claim for breach of the implied duty of good faith and fair dealing.

C. <u>Unjust Enrichment</u>

Williamson claims that PNC entered into a confidentiality agreement with WAI pursuant to which PNC was allowed to become a part of an investment group bidding for the purchase of Griffith. According to Williamson, PNC breached this agreement by using the confidential information that it gathered from Williamson in connection with the PNC's successful purchase of Griffith with an alternate investment group. Williamson claims that as a result of PNC's improper use of the confidential information, it has become unjustly enriched, and is liable to Williamson and WAI.

As stated above, a claim for unjust enrichment is a quasi-contractual claim that is barred if a written contract between the parties governs the subject matter of their dispute. <u>See</u> <u>Briggs</u>, 79 F.Supp.2d at 236. Accordingly a claim that a defendant breached a contract which resulted in a benefit to the defendant at the expense of the plaintiff will not state a claim for unjust enrichment, as there is a contract that governs the subject matter of the dispute. I therefore deny the Williamson plaintiffs' claim for unjust enrichment, as the claim specifically alleges a breach of contract.

D.  <u>Breach of Fiduciary Duty</u>

Williamson and WAI contend that the writings and documents pursuant to which PNC and WAI and Williamson manifested their intent to purchase Griffith and share in the profits of the investment in WAI, established a fiduciary duty between PNC and Williamson.  Williamson and WAI allege that PNC breached its fiduciary duty to them when PNC participated in the purchase of Griffith with a separate group of investors.  I find however, that the documentary evidence, along with Williamson and WAI's course of conduct, establishes that PNC and the Williamson plaintiff's were not involved in a joint venture.

To state a claim for the breach of a fiduciary duty under New York law, "a plaintiff must allege '(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach.'" <u>Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.</u>, 2009 WL 3152874 at *11 (S.D.N.Y., September 29, 2009)(<u>quoting</u> <u>Meisel v. Grunberg</u>, 651 F.Supp.2d 98, 114 (S.D.N.Y.2009).

In the instant case, the Williamson plaintiffs contend that they were joint venturers with PNC, and as joint venturers, they each owed the other a fiduciary duty.  <u>See</u> <u>DIRECTV Group, Inc. v. Darlene Investments, LLC</u>, 2006 WL 2773024, at *5 (S.D.N.Y., September 27, 2006)("Joint adventurers ... owe to one another ... the duty of the finest loyalty.").  I find, however, that the

Williamson plaintiffs have failed to establish that they were joint venturers with PNC.  I therefore find that PNC owed no fiduciary duty to the Williamson plaintiffs.

"The essential elements of a joint venture are an agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint undertaking (i.e., a combination of property, financial resources, effort, skill or knowledge), some degree of joint proprietorship and control over the enterprise; and a provision for the sharing of profits and losses." Kaufman v. Torkan, 51 A.D.3d 977, 979, (N.Y.A.D 2nd Dept. 2008).  In this case, the Williamson plaintiffs have failed to establish that there was any agreement between Williamson and/or WAI and PNC manifesting any intent of the parties to be joint venturers.  Indeed, the only agreement between PNC and WAI is the PNC-Argilus Confidentiality Agreement, which simply required PNC to maintain the confidentiality of certain Griffith information.  Williamson, however, in his deposition testimony, attempted to characterize the confidentiality agreement as a "Joint Venture Agreement."  Deposition Testimony of David Williamson at p. 118.  Moreover, Williamson testified to his belief that the PNC-Argilus Confidentiality Agreement "indefinitely" bound PNC to Williamson because it was he who "had brought PNC to this . . . opportunity, to purchase the assets of Griffith" and therefore, "they would first have an obligation to come to myself to obtain a

release to [talk to Griffith]."  Deposition Testimony of David Williamson at p. 120.

As stated throughout this opinion, however, there is no manner in which the PNC-Argilus Confidentiality Agreement can be read as anything other than an agreement by PNC to keep Griffith information confidential.  Nothing in the agreement even remotely speaks to PNC and Williamson and/or WAI joining together for a joint purpose.  Indeed, WAI and Williamson are not even mentioned or referred to in the body of the Agreement.  The PNC-Argilus Confidentiality Agreement is silent as to contributions by the coventurers to the joint undertaking; joint proprietorship and control over the enterprise; and a provision for the sharing of profits and losses between PNC and WAI.  Nor do the documents in the record taken as a whole suggest that the Williamson plaintiffs and PNC became, or intended to become, joint venturers.

That PNC and WAI may have been working together to effectuate the purchase of Griffith alone does not establish that the parties were part of a joint venture, as "[a] joint venture does not arise simply because two parties have agreed together to act in concert to achieve some stated economic objective." Rocchio v. Biondi, 40 A.D.3d 615, 616-17 (N.Y.A.D. 2nd Dept., 2007).  Moreover, even if the parties could be considered to be joint venturers, because there was no agreement setting forth the terms or duration of the venture, the venture was terminable at will by either party.

<u>Foster v. Kovner</u>, 44 A.D. 3d 23, 27 (N.Y.A.D. 1st Dept., 2007).
Because any joint venture between PNC and the Williamson plaintiffs
could be cancelled at will, any fiduciary duty commensurate to the
joint venture would have been extinguished upon termination of the
venture.

Evidence that the venture was terminable at will comes from
the Williamson plaintiffs' course of conduct. Upon learning that
Energy East wanted Williamson to play a smaller role in the
purchase of Griffith, Griffith immediately sought to work with a
different equity firm, and indeed, prior to January 18, 2003
entered into an agreement with Questor. Deposition Transcript of
David Williamson at pp. 218, 223-24. This course of conduct
reveals that the Williamson plaintiffs did not feel contractually
bound to remain a partner with PNC, and that any joint venture
between the two could be terminated at will.

Finally, evidence that the parties were not joint adventurers
comes from the fact that had the bid for Griffith been successful,
WAI and PNC would have been co-owners of the new corporation that
purchased Griffith. A joint venture, however, "may not be carried
on by individuals through a corporate form; the two forms of
business are mutually exclusive." <u>Bevilacque v. Ford Motor Co.</u>,
125 A.D.2d 516, 519 (N.Y.A.D. 2 Dept., 1986). Accordingly, because
the parties intended to become corporate partners in the event of
a successful bid for Griffith, they can not be considered to have

entered into a joint venture. Because the parties were not joint venturers, I find that the Williamson plaintiffs have failed to establish that PNC owed Williamson a fiduciary duty, and therefore grant defendants' motion to dismiss plaintiffs' claim for the breach of a fiduciary duty.

## CONCLUSION

For the reasons set forth above, I grant defendants' motion for summary judgment with respect to all of the plaintiffs' claims. The plaintiffs' complaints are dismissed with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/ Michael A. Telesca
_____
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          January 15, 2010